IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| JOHN PERRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) Case No. _____ |
| | ) |
| | ) JURY DEMAND |
| HARPERCOLLINS CHRISTIAN | ) |
| PUBLISHING, INC., | ) |
| | ) |
| Defendant. | ) |

## C O M P L A I N T

### I.
### INTRODUCTION

1. John Perry, a celebrated author and biographer, was commissioned by Thomas Nelson, Inc. to write a book titled, *Through My Father's Eyes*, chronicling the life of the late world evangelist Billy Graham as seen through the eyes of his son, Franklin Graham. After the work was completed, Thomas Nelson (now wholly-owned by the Defendant HarperCollins Christian Publishing, Inc.) reneged on its promise to pay to Mr. Perry future royalties on the sale of this book. Mr. Perry now brings this action against Thomas Nelson, Inc. for compensatory damages arising out of its willful, anticipatory breach of contract and declaratory judgment.

### II.
### JURISDICTION

2. This court is vested with jurisdiction pursuant to 28 U.S.C.§ 1331, based on the diversity of citizenship of the parties, and the amount in controversy exceeds $75,000.

3. Venue is proper in the Middle District of Tennessee since all of the actions

alleged took place in this federal district.

### III.
### PARTIES

4.  John Perry is an accomplished author who has written over 30 books, including *Sergeant Alvin York*, *Unshakable Faith*, *Lady of Arlington*, and *Lee- A Life of Virtue*. One of his most recent books, *Letters to God*, was listed on the 2010 New York Times Best Seller List. He resides in the State of Tennessee.

5.  HarperCollins Christian Publishing, Inc., (hereinafter "HarperCollins"), is a foreign corporation, and has its principal corporate offices at 1211 Avenue of the Americas, New York, New York 10036. Its registered agent for service of process is Troy Edens, 501 Nelson Place, Nashville, Davidson County, Tennessee 37214.

### IV.
### FACTS

6.  Franklin Graham is the eldest son of the late, noted evangelist Billy Graham. He is the President and CEO of a world-wide ministry called Samaritan's Purse, headquartered in Boone, North Carolina. He also serves as an evangelist for a separate ministry and organization founded by his father called the Billy Graham Evangelistic Association ("BGEA").

7.  In late 2005 or early 2006, John Perry received a telephone call from a representative of Franklin Graham, inquiring whether he would be willing to serve as a full –time, in-house ghostwriter for Franklin Graham.

8.  Soon afterward, in late winter or early spring of 2006, Mr. Perry traveled to the headquarters of the Billy Graham Evangelistic Association in Charlotte, North Carolina, for an interview.

9. During his interview, Franklin Graham's representative explained the expectations of the job, and also shared with Mr. Perry that the two ministries, BGEA and Samaritan's Purse, were in the process of merging. She mentioned also that there was some concern that as a result of the merger of these two non-profit organizations, some of the donors who had given to both organizations over the years would now make only a single donation to one of the ministries.

10. Mr. Perry came up with an idea for Franklin Graham to write his father's biography from Franklin's own unique perspective, to be published after Billy Graham's death. Mr. Perry suggested how such a biography could tie the two organizations together in a powerful way, form a new and special connection between father and son, and would produce a book that both BGEA and Samaritan's Purse could then market. During his interview, Mr. Perry learned that the two organizations had a combined mailing list of 7 million individuals. This audience, when combined with the estimated 15 million Southern Baptists, tens of millions of American evangelicals, and millions more throughout the world affected by the life and preaching of Billy Graham, produced a sizeable potential market for such a book.

11. Mr. Perry elected not to pursue a position with Billy Graham Evangelistic Association, but he did later speak with his interviewer by telephone and mentioned his idea for the biography on the life of Billy Graham. The interviewer gave him the name of another representative within the Franklin Graham organization, and told him that he could discuss his book proposal with him. Mr. Perry followed up and sent a letter to this contact about this book proposal. The contact person responded with what appeared to be

a type of form letter thanking Mr. Perry for the proposal, but expressing disinterest at that time in such an undertaking.

12. During this time period in 2006, Mr. Perry was writing a book for Thomas Nelson entitled *God Behind Bars*, based on the story of Charles Colson's Prison Fellowship ministry. He shared his idea for the Graham biography with executives at Thomas Nelson, and the concept was well received, and the parties discussed a tentative agreement for Mr. Perry to write this manuscript.

13. Mr. Perry was later informed that Jonathan Merkh and Sam Moore (executives of Thomas Nelson) had pitched his idea for this biography to Franklin Graham, and that Mr. Graham enthusiastically endorsed it.

14. In mid-summer of 2006, Mr. Perry received a call from a representative of Thomas Nelson, announcing that they had a book deal with Franklin Graham based on Mr. Perry's idea. Thomas Nelson offered to hire Mr. Perry to write the book.

15. The offer by Thomas Nelson consisted of a writing fee in the amount of $100,000, plus two royalty points on the book, including any spinoff versions and editions. Mr. Perry was advised that a "cover credit was off the table." Franklin Graham did not want to share credit with him as a ghostwriter. Mr. Perry accepted Thomas Nelson's offer.

16. On October 27, 2006, the parties entered into an Independent Contractor agreement that set forth the terms of the book contract for *Through My Father's Eyes*. A true and correct copy of this contract signed by John Perry and Jonathan Merkh, Senior Vice President and Publisher on behalf of Thomas Nelson, is attached hereto as Exhibit A and is incorporated herein by reference.

4

Case 3:18-cv-00416   Document 1   Filed 05/02/18   Page 4 of 11 PageID #: 4

17. The compensation terms under this Independent Contractor agreement provided as follows:

> **5. Compensation.** For the satisfactory completion of all Services to be performed by Contractor under this Agreement, Publisher shall pay a total of One Hundred Thousand Dollars ($100,000.00). Payment will be made as follows:
>
> Fifty Thousand Dollars ($50,000.00) paid within ten (10) days of Publisher's receipt of a signed Letter of Intent from Writer; and
>
> Fifty Thousand Dollars ($50,000.00) within thirty (30) days of receipt of a fully signed Manuscript Verification Form acknowledging that the manuscript is in acceptable form by Author and Publisher.
>
> **5.1** In addition to the above compensation, Publisher agrees to pay to Contractor a two percent (2%) royalty based on Publisher's net sales of the Work sold *in any market or in any format including all possible variations mentioned in the contract Publisher has with Author.*
>
> **5.2** Publisher will reimburse Writer for travel related to the preparation of a fully acceptable manuscript. Such travel must be pre-approved or arranged by Publisher. Reimbursement shall be made within thirty (30) days of Publisher's receipt of approved invoices. Invoices not to be submitted more frequently than once a month.

Exhibit A at ¶ 5.

18. In addition, the contract provided the following right and opportunity to Mr. Perry, as the Contractor, to cure any portion of the manuscript that Thomas Nelson, as Publisher, found objectionable.

> Publisher may terminate this Agreement if Contractor fails to provide the Services and deliver the completed work by the time specified in Paragraph 2, excepting acts of God, or if Publisher determines, in its sole discretion, that all or a portion of the Work is not satisfactory after Contractor has had an opportunity and thirty (30) days to remedy specifically identified writing in need of modification.

Exhibit A at ¶ 12.

19. Very shortly after the original contract was signed, Mr. Perry traveled with Franklin Graham and some of his board members to an event in Quito, Ecuador. In early

2007, he also traveled with Mr. Graham and his entourage to a similar event in Winnipeg, Canada. The Plaintiff took notes along the way, and conducted several interviews with Mr. Graham during these visits for later use in writing the biography.

20. During this time frame in 2007, Mr. Perry formed a working relationship with Franklin Graham. He regularly sent sections of the rough manuscript to him, solicited his review and comment, and asked his staff for specific information. In all of his meetings and conversations with Franklin Graham, Mr. Graham expressed nothing but praise and encouraging comments about Mr. Perry's work. When the Billy Graham Library opened in the spring of 2007, Franklin Graham invited Mr. Perry to attend, and when he arrived, broke away from the group he was with, and made a point of welcoming Mr. Perry to the event.

21. In February of 2007, Mr. Perry requested and received an advance from Thomas Nelson in the amount of $12,000. (A true and correct copy of the transmittal letter from Thomas Nelson enclosing this advance payment is attached hereto as Exhibit C and is incorporated herein by reference).

22. In the early summer of 2007, Thomas Nelson contacted Mr. Perry to advise that Franklin Graham was unhappy with his manuscript, and that Thomas Nelson had unilaterally decided to "take him off of the project."

23. Shocked by this news, Mr. Perry wrote a letter to Mr. Graham expressing his surprise and disappointment.

24. Mr. Graham responded expressing concern that Mr. Perry was taking credit for the book idea that Thomas Nelson had originated and pitched to him. Mr. Perry then sent a second letter to Mr. Graham pointing out that he (Mr. Perry) had come up with the idea

for the book and had sold Thomas Nelson on the idea. No response was ever received to this second letter.

25. Shortly thereafter, Mr. Perry learned from Thomas Nelson that Richard Christian was the new agent for Franklin Graham, and that it was Mr. Christian – not Franklin Graham --- who had requested that Mr. Perry be taken off the book project. Mr. Christian then selected a writer of his choice to use for the project.

26. Thomas Nelson never specifically identified any portion of the manuscript that was unacceptable. Nor did Thomas Nelson ever provide Mr. Perry with a thirty-day opportunity, as required in ¶ 12 of the Independent Contractor Agreement, to cure any such concerns with an identified portion of the work.

27. Despite taking Mr. Perry off the project, Thomas Nelson initially agreed to pay Mr. Perry the balance of his fee, if he would pay his agent's 15% fee. Mr. Perry reluctantly agreed to this condition.

28. The contract was later amended as follows on June 5, 2007, to revise the advance payable to Mr. Perry:

> WHEREAS, Contractor has asked Publisher to revise that section of the Agreement regarding manuscript payment of Fifty Thousand Dollars ($50,000.00) following receipt of a fully executed Manuscript Verification Form signed by the Author and Publisher stating the manuscript is complete and fully acceptable to all parties concerned, to now reflect that Contractor received Twelve Thousand Dollars ($12,000.00) of that amount from Publisher on February 6, 2007, without deduction of Agent's fifteen percent (15%). Further, Contractor has requested payment of the remaining Thirty Eight Thousand Dollars ($38,000.00) prior to Publisher's receipt of a fully executed Manuscript Verification Form.

(A true and correct copy of the Amendment to Independent Contractor Agreement entered into on June 5, 2007, is attached hereto as Exhibit B and is incorporated herein by reference).

29. On or about December 18, 2015, HarperCollins acquired ownership of Thomas Nelson, Inc.

30. On February 9, 2018, Mr. Perry contacted Thomas Nelson and inquired of Matthew Baugher about selling his royalty participation in the book *Through My Father's Eyes* for an agreed upon lump sum.

31. On February 15, 2018, Mr Baugher responded stating that since Mr. Perry had been replaced as the writer for the book, he had no claim to his royalty percentage. This was the first time that anyone with HarperCollins disavowed or rescinded the Plaintiff's entitlement to future royalties as specifically memorialized in the contract. (Exhibit A at ¶ 5.1).

32. On May 1, 2018, HarperCollins released the book *Through My Father's Eyes*. As of the date of filing of this Complaint, the book is ranked number 32 on the Amazon Top 100 bookseller's list. (A true and correct copy of the cover of this book and its copyright registration page is attached hereto as Exhibit D).

## IV.
## CAUSES OF ACTION

### COUNT I
### Anticipatory Breach of Contract

33. Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs, and does further allege as follows.

34. The actions of the Defendant constitute an actionable anticipatory breach of contract.

35. As a direct and proximate result of the Defendant's anticipatory breach of contract, the Plaintiff has suffered damage in an amount equal to the combined loss of

8

royalties at the rate of 2 percent from the anticipated sales of the book *Through My Father's Eyes*.

36. The Plaintiff would further allege and aver that due to the recent death of Rev. Billy Graham on February 21, 2018, the anticipated revenues from the sale of this book are expected to exceed several million dollars.

## COUNT II.
## Unjust Enrichment

37. Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs, and does further allege as follows.

38. The actions of the Defendant, if it is allowed to market and sell the book *Through My Father's Eyes*, and to retain the contracted royalties due and payable to the Plaintiff, would result in an unjust enrichment of the Defendant and a corresponding economic injury to the Plaintiff.

## COUNT III.
## Promissory Fraud

39. Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs, and does further allege as follows.

40. The Plaintiff reasonably relied upon the representations made by the Defendant's predecessor-in-interest Thomas Nelson, as an incentive and inducement to enter into the Independent Contractor Agreement.

41. On or about February 15, 2018, the Plaintiff learned for the first time that these representations by Thomas Nelson were knowingly false and were being repudiated by the Defendant.

42. As a consequence of the Plaintiff's reliance on these false representations, he has suffered economic injury in an amount yet to be determined.

## COUNT IV.
## Declaratory Judgment Act
## 28 U.S.C. § 2201

43. Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs, and does further allege as follows.

44. A dispute exists between the parties regarding the rights inuring to the Plaintiff by virtue of the royalty provision in the Independent Contractor agreement (Exhibit A).

45. A declaratory judgment would serve a useful purpose in clarifying the legal relations at issue.

WHEREFORE, PLAINTIFF REQUESTS THE FOLLOWING RELIEF:

1. That he be allowed to file this Complaint, and that process issue to the Defendant, HarperCollins Christian Publishing, Inc., requiring it to respond within the time required under the Federal Rules of Civil Procedure;

2. That at the trial of this case, the Plaintiff have and receive judgment against the Defendant in the amount of $3,000.000.00, or such amount to be determined by the jury;

3. That the Court issue a declaratory judgment finding that the Plaintiff's legal and equitable rights to receive the royalties that were stipulated to by the parties are protected;

4. That the Plaintiff be awarded such further and general relief as to which he may be entitled, including the costs of this cause and reasonable attorney's fees.

Respectfully submitted,



/s/ *Larry L. Crain, Esq.*
Larry L. Crain
Tn. Supr. Crt. No. 9040
5214 Maryland Way
Suite 402
Brentwood, TN  37027
Tel.  615-376-2600
Fax. 615-345-6009
Larry@CSAFirm.com

*Counsel for the Plaintiff*